James Earl **RAY**, Petitioner,

v.

**J. H. ROSE**, Warden, Respondent.

Civ., No. 74–166.

United States District Court,

W. D. Tennessee, W. D.

Feb. 27, 1975.

James H. Lesar, Washington, D. C., Robert I. Livingston, Memphis, Tenn., Bernard Fensterwald, Jr., Washington, D. C., for petitioner.

W. Henry Haile, Asst. Atty. Gen., Nashville, Tenn., for respondent.

## MEMORANDUM DECISION

McRAE, District Judge.

Pursuant to a remand by the Court of Appeals for the Sixth Circuit this Court conducted an evidentiary hearing in this habeas corpus case. Ray v. Rose, Warden, 491 F.2d 285 (C.A. 6, 1974). The hearing lasted eight days, during which 165 exhibits were offered. Prior to the evidentiary hearing the Court conducted a preliminary hearing and entered an Order on June 24, 1974, which, *inter alia,* set forth the issues to be resolved pursuant to the Court of Appeals Opinion. That Order set forth two primary constitutional issues: first, whether or not James Earl Ray had the effective assistance of counsel with regard to the charge against him for the murder of Dr. Martin Luther King, Jr.; second, whether the guilty plea by Ray in the Criminal Court of Shelby County, Tennessee, to that charge was made intelligently and voluntarily.

Included in the second question are the issues pertaining to the contentions of coercion, threats, and promises of Ray's attorneys in furtherance of an alleged conflict of interest between the respective attorneys and their client, Ray.

This Court's Order of June 24, 1974, also noted eleven specific factual issues set forth in the Court of Appeals Opinion, and other specific factual issues raised by the attorneys, all of which pertained to the respective contentions of the parties as to the total circumstances which must be factually resolved before the applicable conclusions of law can be made.

It is ingrained into the history of this nation that Dr. Martin Luther King, Jr. was assassinated in Memphis, Tennessee, by a rifle shot on April 4, 1968. A first

degree murder indictment was returned against James Earl Ray in the Criminal Court of Shelby County, Tennessee, on May 7, 1968, for that slaying. He was arrested in London, England, on June 8, 1968. He was returned to Memphis on July 19, 1968. On March 10, 1969, he pleaded guilty and received a previously agreed upon ninety-nine year sentence.

At the time that Ray was arrested in London he was using the name of Ramon George Sneyd. After his arrest British counsel was appointed for him, and his extradition was opposed, albeit unsuccessfully. Prior to his extradition he communicated with F. Lee Bailey of Massachussetts and Arthur J. Hanes of Birmingham, Alabama, as prospective attorneys in the event of his return to Memphis, Tennessee, to stand trial on the murder charge. F. Lee Bailey was not available, but Arthur Hanes was.

In his written communication to Hanes, Ray indicated that he was contacting him because Ray understood that Hanes had tried a case similar to the one against Ray. Ex. 136. Other proof reflects that Ray had lived in Birmingham, and that the other case was Hanes' defense of Alabama residents in a case pertaining to the death of a Detroit woman, Mrs. Luizzo. That case also had racial civil rights overtones. Other proof also reflects that Hanes was the former mayor of Birmingham, Alabama, and that he was reputed to be a conservative on racial issues.

After Hanes was contacted, he and his son, Arthur Hanes, Jr., went to England. The first trip was in June 1968, and it proved unsuccessful because they were not allowed to see their famous client. Prior to their first trip to London they were contacted by the established author, William Bradford Huie of Hartselle, Alabama. Huie indicated to Hanes that he would like to discuss writing Ray's story. As reasons for allowing him to do so, he suggested that he could present Ray to the public in a more favorable image than he was receiving from the news media at that time and that the sale of his writings would be a means of raising money for Ray's defense.

In early July, 1968, a second trip to London was made by Hanes. This time he took with him written instruments furnished by Huie. One instrument was a very broad power of attorney that Ray signed on July 5, 1968, giving Hanes authority to act for him. Ex. 1. By the terms of another instrument, also signed by Ray and dated July 5, 1968, Ray transferred to Hanes 40 percent of that which he would receive as the result of a subsequent agreement with Huie, dated July 8, 1968. The July 5 agreement also appointed Hanes to act as "exclusive agent and attorney for Ray in the handling of his affairs, contracts, negotiations, and sale of any and all rights to information or privacy that he may have in and to his life or particular events therein to persons, groups, or corporations for the purpose of writing, publishing, filming, or telecasting in any form whatever." Ex. 2A.

On July 8, 1968, Hanes and Huie executed an agreement in which they and Ray were the three parties. Ex. 3A. After Ray was returned to Memphis, Hanes furnished Ray a copy of that agreement for him to consider and sign if he approved. Ray testified that he kept the agreement and after several days decided to sign it because his attorney recommended it and he thought he had no other choice for raising money for defense expenses. Ray executed a copy of this agreement on August 1, 1968. Ex. 3B.

The only other means of raising funds for the expenses of the defense reflected by the proof was the possibility of a campaign for public subscriptions. However, this was not recommended or approved by Hanes for the reason that the campaign would attract white racists and Ray did not need any more of that image. Some unsolicited contributions were received and a post office box was rented for that purpose, but these monies were *de minimus* for the type of attorneys chosen by Ray.

The three party agreement provided that Ray give Huie exclusive rights to write literary material dealing with "the assassination of Martin Luther King, Jr., the alleged participation of Ray therein, and the trial, for the purpose of establishing the truth with respect thereto." The agreement identified Hanes as the attorney defending Ray for the murder of Dr. King. In the agreement, Huie agreed to pay to Hanes and Ray, each, 30 percent of the gross receipts from the literary works. He also agreed to furnish, at quarterly intervals, statements reflecting all transactions in reasonable detail and to furnish Ray and Hanes copies of all contracts entered into by him. Huie did not comply with either of these two latter mentioned provisions.

It should also be noted that the July 8 agreement between the three parties was accompanied by a letter from Huie, also dated July 8, 1968. In this letter he set forth the schedule of cash payments of $35,000 that he agreed to make. The first was a payment of $10,000, to be made when he signed the first contract to write about Ray. In the letter it was assumed that this would be between July 15 and 20, 1968. The second payment was to be made on the first day after Ray was lodged in a jail in the United States. Five more payments were to be made at successive monthly intervals. Thereafter, any monies received would be paid in accordance with the 30-30-40 division set forth in the agreement. The letter was prepared for the approval of all parties, and it was signed in the same manner as the three party agreement of July 8. Ex. 4A and 4B.

In September 1968, at the request of Ray, the July 5 agreement between him and Hanes was amended. The provision whereby Hanes was to receive 40 percent of the money that was received by Ray from Huie was amended to limit the amount to be received by Hanes to $20,-000 plus expenses. Ex. 2B. Ray testified that he made this request because

he understood that Hanes was employed to handle the murder case only in the trial court. Therefore, he wanted to have a potential financial reserve for an appeal or post conviction proceedings.

In furtherance of his exclusive literary rights, Huie entered into a memorandum agreement with Cowles Communications, Inc. on July 11, 1968, to write a series of articles for publication in *Look* magazine. Ex. 5. This memorandum agreement was replaced by a more formal agreement between Huie and Cowles, dated October 7, 1968, which provided for two pretrial articles by Huie about Ray and a post trial article on "how, why, and by whom Dr. Martin Luther King, Jr. was assassinated, Ray's part in it, and his ultimate capture." Ex. 6. This agreement was amended by an instrument dated March 17, 1969, which reduced the monetary value of the Ray story due to the guilty plea. Although the amended agreement, Ex. 8, is dated March 17, 1969, it was drafted prior thereto because one of its premises recited that it "is expected" that Ray will plead guilty on or about March 10, 1969. The amendment significantly reduced the length of the third writing to be submitted by Huie, and it reduced the guaranteed balance to be paid by Cowles to Huie from $45,000 to $20,000. However, it specifically preserved a royalty provision in the earlier agreement for a percentage of the gross proceeds which Cowles might receive from the sales of Huie's efforts to other publishers throughout the world. The amending agreement also provided that Huie would obtain from Hanes and his successor as attorney for James Earl Ray, Percy Foreman, separate articles of 1,000 words, for which each would be paid $1,000 by Cowles.

All of the agreements and amendments with Cowles were signed only by Huie, and no copies were furnished Ray at that time. He first saw them during the preparation for the hearing in this case.

The three party agreement between Ray, Huie, and Hanes contemplated that

Ray would furnish Huie information during personal visits in the jail. However, this plan was thwarted because the trial judge to whom the case was assigned, The Honorable Preston Battle, placed very severe restrictions upon who could see Ray in the Shelby County Jail. As a consequence, Huie was forced to obtain his information from Ray by an exchange of letters or lists of questions by Huie and answers by Ray, with the attorneys, first Hanes, then Foreman, serving as couriers. Collective Exhibit 7 to Huie's deposition consists of many of Ray's writings to Huie. After Huie received the information, he undertook to make a personal investigation in order to verify, attempt to verify, or supplement the information furnished by Ray. This included an investigation of the activities of Ray from the time of his escape from the Missouri State Penitentiary in April 1967 until his capture in London in June of 1968. The investigation took Huie to Mexico, Canada, and California in addition to the prominent southern cities obviously involved, such as Memphis, Atlanta, and Birmingham.

Although the results of Huie's investigation were shared with the successive attorneys, Huie was not considered by the attorneys as the hired investigator for Ray's defenses at the trial. Huie agreed with Ray that he would not write and publish before Ray's trial anything setting forth Ray's activities during the latter part of March 1968. Ray testified in this case that Huie honored that agreement.

It should be noted that Huie believed that he was searching for the true story on the death of Martin Luther King, Jr. Based upon his prior experiences, Huie believed that the true story was not necessarily reflected by the result of a criminal trial. One of his successful magazine articles was a *true* account of the death of Emmett Till by two half brothers after they had been acquitted of the young Negro's murder in the mid nineteen fifties.

In the latter part of October, or possibly the early part of November, Huie wrote two articles, which appeared in the *Look* magazines dated November 12 and 26, 1968. Ex. 73 and 74. At the time these were written it was thought that the trial would commence November 12, 1968. Accordingly, factual matters pertaining to Ray's activities immediately prior to and on the day of the assassination were not included in the articles. They did include much background information about Ray, particularly after he escaped from the Missouri State Penitentiary. The articles also referred to some of Ray's alleged Canadian activity with the mysterious Raoul, the alleged conspirator and perpetrator of the death of Dr. King. The first two articles definitely indicated that Dr. King was the victim of a conspiracy.

The third *Look* article by Huie was published in the magazine dated April 15, 1969. Ex. 75. This was an account of the murder of Dr. King by Ray without assistance from others. The same issue of *Look* included the 1,000 word articles by Hanes and Foreman. Ex. 76 and 77. Hanes' article was entitled "For Conspiracy," and Foreman's was entitled "Against Conspiracy." Huie partially rewrote and added to the original drafts prepared by the respective attorneys. Both attorneys now contend that the articles do not reflect accurate versions in all respects.

The proof in this case also reflects that by instrument dated November 20, 1968, Huie entered into a written agreement with Dell Publishing Company of New York, N. Y. This pertained to a non fiction book about Ray to be written by Huie, which was assigned a working title, *They Slew the Dreamer*. Ex. 7. The agreement provided for a minimum guaranty of $40,000 to be applied against royalties from sales as set forth in the agreement. By letter dated April 3, 1969, due to the guilty plea, this minimum guaranty was reduced to $10,000. The letter also provided that

$5,000 of $15,000 previously paid on the original minimum guaranty was charged to royalties due to Huie by Dell for another book totally unrelated to Ray and Dr. King's murder.

The original agreement of November 20, 1968, was a printed agreement which had portions stricken and other portions added as appropriate for the subject matter. Two "special agreements," numbered paragraphs 19 and 21, bear noticing herein. Number 19 provided that publication would not be sooner than four weeks after the final *Look* magazine article; however, in any event, Dell could publish the book on or after March 5, 1969. The book was not published until May 20, 1970. This Court finds that the provision that Dell could publish the book after March 5, 1969, was not a factor that directly or indirectly caused Ray to plead guilty on March 10, 1969. In special agreement Number 21 Huie agreed that none of the proceeds from the contract "shall directly or indirectly be used for the benefit of James Earl Ray." Huie was either unaware of this provision in the contract or he was prepared to violate it when the book produced any royalties.

By agreement typed for execution in December 1968 but actually dated January 29, 1969, Ray and Hanes on the one hand and Huie on the other appropriately granted releases to each other with regard to the executed portions of their earlier three party agreement, and Hanes transferred all of his rights to royalties from Huie to Ray. Ex. 9A.

On February 3, 1969, Ray transferred to Foreman *all* of his rights to proceeds due him from Huie under the basic agreement of July 8, 1968. Ex. 10.

On March 9, 1969, by two letters, Foreman conditionally reassigned to Ray all of the royalties due from Huie in excess of $165,500. Ex. 11A and 11B. The condition was that the guilty plea by Ray would go through without any

unseemly conduct on Ray's part in Court. The amount of $165,500 was itemized by Foreman as $150,000 for his fee, $15,000 for expenses, and $500 for a cash advance to Jerry Ray, brother of Ray.

According to the proof, Huie received $62,871.85 from Cowles for his articles written for *Look* magazine. Huie's book, *He Slew the Dreamer*, earned $4,461.69 in royalties from Delacorte Press. Ex. 3 to Dep. of Huie. This was credited against the $10,000 advance out of which Huie's agent had taken $1,000 at the time the advance was paid.[1] From the sale of the book through his publisher in England, royalties of approximately $700 were earned and applied against an advance of approximately $1,800. Although there are references to the potential sale of movie rights, there is no proof to support the likelihood of any proceeds from the sale of movie rights or any further literary royalties from any other source.

Huie paid to Hanes $30,000, and to Foreman $10,000 to be applied to their expenses and fees. Ex. 12. As noted above, Hanes and Foreman each received $1,000 per article in *Look* magazine after the guilty plea was entered. Although they are not itemized, the proof reflects that Huie, Hanes, and Foreman all incurred sizeable expenses for travel and lodging as well as various other kinds of expenses. For example, all of Huie's earnings are subject to a ten percent fee for his agent. Foreman rented a room in a downtown hotel in Memphis from November 1968 until March 1969, in which he maintained rented office equipment as well as his Memphis living accommodations.

It is also noted that Ray assigned to Foreman his interest in a white Mustang found in Atlanta and the rifle found on the street in Memphis immediately after the murder of Dr. King. However, these items were attached in

---

1. Although the contract between Huie and Dell Publishing Company refers to the advance as a "minimum guaranty," Huie takes the position that he is charged with all portions of the advance that were not earned.

litigation filed by Renfro Hays, a private investigator hired by Hanes. The proof in this case is not clear as to the ultimate disposition of those items.

Through the testimony of Victor Timkin, the general counsel of Bantam Books, it was shown that sizeable losses were incurred on books published by them which were written about James Earl Ray and the murder of Dr. King. One was *The Strange Case of James Earl Ray*, by Clay Blair. It was planned for release immediately after the trial. It was published after the guilty plea, and showed a net loss of $24,646. Ex. 158. The other book was *An American Death*, which was an in-depth study by the well-known author Gerold Frank, who received $100,000 as a guaranteed royalty. In spite of favorable reviews, Bantam Books lost $105,138 on this book. Ex. 158.

In Mr. Timkin's opinion, Ray's guilty plea destroyed the appeal of books about him, whereas a trial would have stimulated sales. This testimony was corroborated by profit statements taken from the records of Bantam Books with regard to books about Dr. Sam Sheppard and Candy Mosler, both of whom had sensational trials.

Based upon that testimony and the fact that Huie's guaranteed royalties from Cowles and Dell Publishing Companies were substantially reduced after the guilty plea was agreed to by Ray, this Court finds that the guilty plea, in lieu of a trial, substantially reduced the amount of prospective income from literary royalties to Ray and his attorneys.

It is now necessary to set forth facts that pertain to the efforts of the attorneys and their relationship with Ray.

After Ray was returned to Memphis, Hanes and his son came to Memphis and commenced their representation. Initially, Judge Battle set the trial for September 1968, but later, on his own motion, reset it for November 12, 1968.

Contention (1) of the petitioner as set forth in the Court of Appeals remand opinion 491 F.2d page 287 charges that Hanes authorized Huie to conduct the investigation and refused to hire a professional investigator. As previously indicated, this Court finds that Hanes did not consider Huie his investigator for the trial, even though Hanes, and later Foreman, received some useful information from Huie. Hanes and his son did much of their own investigation, but did not reduce all of it to written form. Furthermore, Hanes paid Renfro Hays, a private investigator, approximately $700 for investigations conducted by him. Although the effectiveness of Renfro Hays has been a disputed issue in this and other forums, both of the Messrs. Hanes testified in this cause that he was very helpful, particularly with regard to obtaining entrance to housing and businesses frequented by lower income witnesses. Renfro Hays later sued James Earl Ray for services rendered, and received a judgment against Ray for approximately $6,000. This Court finds that Contention (1) is not supported by the proof, but the contrary is.

The Messrs. Hanes both testified at the hearing that they were ready to go to trial on November 12, 1968, and would have done so had they not been advised when they came to Memphis on November 10 to make final preparations for the trial that they were fired as attorneys in the case.

Hanes, Sr. testified that Ray did suggest about one week before the scheduled November trial date that a continuance be sought. However, Hanes did not agree, because Judge Battle had strongly discouraged a postponement. This Court finds that there is no proof to support the charge set forth in Contention (3) of the Court of Appeals Opinion 491 F.2d at page 287 wherein the alleged reason for Hanes' refusal to request a continuance was based upon the fact that their contract with Huie

provided that they must go to trial within a certain number of days. In fact, the proof is to the contrary with regard to a November 12, 1968, trial date. See Ex. 4A, a letter of July 8, 1968, from Huie, which contemplates Huie's having the book finished five months after Ray's return to the United States. Furthermore, the significance of this alleged impropriety is mooted by the fact that a continuance was obtained because Ray changed attorneys.

■ Contention (2) in the Court of Appeals Opinion, 491 F.2d at page 287, asserts that Hanes rejected Ray's expressed desire to take the stand and testify in his own behalf because that would be giving away testimony that could be sold. In the first place, the Court finds that Hanes did not say that. This Court also finds that the attorneys Hanes had not determined whether they would advise Ray to testify at his trial. They testified that he had been "rehearsed" in the event he did testify, and that the decision would not be made until the end of the State's proof, as is usually done.

Before proceeding to the role of Foreman in the criminal case, the Court makes certain additional findings with regard to Hanes. Ray testified that he did not tell Hanes everything about the case. He further testified that he did not lie to Hanes or mislead him. However, Hanes testified that Ray told him that a person with a white sheet around him jumped into the Mustang as Ray was fleeing the area from which the fatal shot was allegedly fired. Ray now admits that he said that to Huie and that there was no basis in fact for this statement.

■ Ray was persuaded to fire Hanes by his brothers and Foreman, primarily upon the accusation that Hanes was working for Huie in preference to Ray. The proof does not support the fact that Hanes allowed Huie to dictate the manner in which the criminal case would be tried. Ray testified at the hearing that he would have been willing to go to trial with Hanes as his lawyer had he not been persuaded to hire Foreman.

On March 16, 1969, six days after the guilty plea, Ray wrote Hanes and told him that Hanes had been right and that he, Ray, should not have listened to Foreman tell him that Hanes was working for Huie. Ex. 157.

The pretrial discovery which Hanes obtained by order of Judge Battle was considerably broader than customarily granted in Tennessee. The results of this were made available to Foreman. Ex. 155.

The Messrs. Hanes believed that the vast news media accounts of the King murder and Ray's alleged participation were for the most part unfavorable, and that it was to Ray's best interest that this should be and was in some measure counteracted in the fall of 1968 by favorable publicity from Huie, particularly with regard to the possibility of a conspiracy.

As indicated above, Ray's brother, Jerry Ray, was a persuasive factor in the employment of Foreman and the firing of Hanes. Jerry was the more aggressive of the two brothers who are referred to so often in the proof. It should be noted that the announcement of the search for and capture of Ray immediately caused widespread investigations by writers. These investigations included Ray's family as well as persons who had done business with him or who had otherwise known him. See Ex. 25, article in *Life* magazine, May 3, 1968. James Earl Ray and to a lesser extent the members of his family were made internationally famous. This prominence and the matters to be decided in the light thereof were far beyond anything that the members of the Ray family had ever experienced, and Jerry Ray and John Ray, as members of the family, were cleared as visitors who might see Ray in the Shelby County Jail. They did visit him many times. At that time John Ray was operating a tavern and Jerry Ray was looking for work.

The proof establishes that all three Ray brothers were impressed with their sudden prominence. It is apparent that Jerry Ray also used it as an opportunity to make small amounts of money. He testified that reporters gave him money from time to time. *Life* magazine gave him $50 or $100 for an interview in 1968; George McMillan, a writer, gave him $500; Huie, on one occasion, gave him an airplane ticket to Huntsville, Alabama, and $100 or $150; and after the guilty plea Huie gave Jerry and John Ray $40 or $50 at their hotel. The correspondence also shows that James Earl Ray was trying to get Hanes to obtain a job for Jerry Ray. Ex. 138.

Jerry Ray testified that he first contacted Foreman about two or three weeks before he came into the case, which was on November 10, 1968. Jerry Ray recommended Foreman to his brother because of Foreman's reputation. James Earl Ray declined to accept the recommendation and did not authorize Jerry Ray to pursue the hiring of Foreman. Foreman came to Memphis at the request of Jerry Ray after Jerry had made a trip to Huntsville, Alabama, to see Huie on November 1, 1968. Many phases of the Huntsville visit are disputed, including which of the two persons involved initiated the idea that the meeting would be held. Based upon the version of Jerry Ray, it is contended that Huie initiated the meeting because he did not want Ray to take the stand and testify in his own behalf at the trial then scheduled to commence November 12, 1968, because allegedly it would destroy the book sales. It is further contended that Huie offered $12,000 to Ray or his family if he would refuse to testify. Ray v. Rose, *supra*, at page 287 fn. 2.

After the meeting, Jerry Ray went to see his brother and tried to persuade him to change lawyers by authorizing him to contact Foreman. However, as late as four or five days from the scheduled trial date Ray refused to write Foreman the necessary letter, and stated he would go to trial with Hanes. In spite of the attitude of Ray, Jerry Ray contacted Foreman and arranged for him to meet Jerry and John Ray at a motel in Memphis on November 10, 1968.

With regard to the meeting at Huntsville the Court does not determine who made the initial contact. Huie paid Jerry Ray's transportation and undertook to explain to Jerry Ray the three party agreement between Hanes, Huie, and Ray. Undoubtedly Huie told Jerry Ray that he expected Ray to tell Huie what he, Ray, knew about the murder of King, including his part in it. At that time that topic was subject to an agreement that Huie would not publish this information prior to the trial. Huie also explained to Jerry Ray that the agreement originally contemplated that Ray or his designee was to get one half of all monies that Huie paid from time to time, but that Hanes had received all of the money. Huie stated at the meeting that he thought Hanes should repay some of this to Ray. This apparently was the source of the alleged bribe for Ray not to take the stand.

In any event it is noted that James Earl Ray had not complained about the money paid to Hanes. Furthermore, Ray never considered Jerry Ray's understanding of his conversation with Huie as an offer that was tempting to him. Additionally, there is no proof or inference that Jerry Ray's erroneous account to his brother—of the existence of the alleged bribe—was a factor in Ray's ultimate guilty plea made more than four months later.

At the meeting between Jerry and John Ray and Foreman at the motel near the airport in Memphis on November 10, 1968, the contracts with Hanes and Huie were discussed. Then the group adjourned to the Shelby County Jail, where Foreman spent two hours with James Earl Ray, without John and Jerry Ray present. Ex. 44. At that time Foreman expressed to Ray his disapproval of the contractual relationship

between Hanes, Huie, and Ray as not being in Ray's best interest. He further indicated that it was his opinion that the contracts could be broken. On that day, with Foreman's help, Ray wrote a letter firing Hanes. Ex. 31. Foreman was retained. At that time Foreman also took the position that no money would be forthcoming from Huie or any other writers until after the trial. As indicated above, this was changed at Foreman's instigation in late January and early Februray 1969.

On November 12, 1968, Foreman appeared in Court and obtained a continuance of the case, over the opposition of the State, until March 3, 1969. In granting the continuance the Court instructed Foreman to make a progress report in one month.

On December 18, 1968, a hearing was conducted by Judge Battle to determine the state of readiness. Exhibit 83 is a transcript of that hearing. Foreman eloquently and vigorously asserted Ray's rights and emphasized two primary points: there was no money for his fee and expenses, and he did not see how he could be ready by March 3, 1969. Judge Battle determined that Ray was eligible for the services of the Public Defender of Shelby County, and appointed the Public Defender for both investigation and representation purposes to serve under the direction of Foreman.

In January of 1969 Foreman was ill in Texas, and therefore could not come to Memphis. On January 17 Judge Battle conducted another progress report hearing. Hugh Stanton, Sr., the Public Defender, was present, as was Ray, but Foreman, due to his illness, was not. At that hearing Judge Battle indicated that he wanted to try the case on March 3 if "humanly possible," and he changed the nature of the Public Defender's responsibility. He directed the Public Defender to prepare to take full charge of Ray's defense if that should become necessary due to Fore-

man's illness or for any other reason. Ex. 84.

On January 20, 1969, Hugh Stanton, Sr., the Public Defender, went to the Shelby County Jail to confer with Ray. Ex. 44. However, Ray refused to see him. This refusal was followed by a letter from Ray to Stanton, written January 20, 1969, in which Ray stated that Foreman was chief counsel and if for any reason Foreman could not serve, Ray would hire someone else.

Foreman recovered from his illness and returned to Memphis on January 21, 1969. Pursuant to the Court's prior direction, the Public Defender's Office devoted extensive time and effort to the investigation of the case, some of which was pursuant to Foreman's specific written requests. On February 7, 1969, a hearing was conducted in Judge Battle's Court on four motions filed by Foreman. These pertained to the right to take depositions, the duty of the sheriff to return subpoenas to the Clerk's Office, the right of Huie to visit Ray, and the right to permit photographs of Ray. This hearing produced a transcript of 87 pages. Ex. 85. With regard to the matters considered in that hearing, the manner in which the contentions of the defendant were presented by Foreman clearly exceeded the minimum requirements for effective assistance of counsel set forth in Beasley v. United States, 491 F.2d 687 (C.A.6, 1974).

On February 14, 1969, another hearing was conducted, at which the Court ruled on other motions of the defendant. Ex. 86. At that hearing, on the motion of Foreman, the case was reset from March 3 to April 7, 1969.

At a meeting between Hugh Stanton, Sr. and Foreman in December, after Stanton was appointed by the Court to assist Foreman, a discussion was had, out of Ray's presence, concerning the possibility of a guilty plea with a bargained for and agreed upon sentence. The subject was raised by Stanton.

Foreman authorized him to make the initial contact with the then Attorney General Phil M. Canale, who in turn consulted with various persons, including representatives of the widow of Dr. Martin Luther King, Jr. After these clearances, the Attorney General indicated that the request for disposition on a guilty plea should come from Ray. Meanwhile, Hugh Stanton, Jr., an Assistant Public Defender, was actively and very thoroughly preparing for trial with the help of two staff investigators.

The proof is not clear when Foreman first discussed the possibility of a guilty plea with Ray. However, the record reflects that Foreman wrote a letter to Ray dated February 13, 1969, which contained an "analysis" of the case and Foreman's recommendations. The "analysis" included an opinion that there was a "little more than a 99 percent chance" of a death penalty verdict and a "100 percent chance of a guilty verdict." In the letter Foreman also stated that he would consider it "one of the great accomplishments" of his career if he could save Ray's life by a negotiated plea. Obviously for his own future use, Foreman had Ray acknowledge receipt of the letter by signing a copy of it. Ex. 147. However, Ray did not sign it the day it was delivered. Ray testified that Foreman raised his voice about Ray's signing it. Ray did acknowledge receipt by signing it, but he does not remember exactly when.

By letter drafted and typed by Foreman for Ray's signature and dated February 18, 1969, Ray gave Foreman written authorization to negotiate a guilty plea for a term of years. The letter was addressed to Foreman, and in its second paragraph it said that the two of them had concluded that it was impossible to controvert certain incriminating facts and that they both believed that a trial would result in a guilty verdict with a sentence of life, ninety-nine years, or the electric chair. Ex. 41. At the hearing in this Court, Ray ac-

knowledged that certain incriminating facts could not be controverted, but he testified that he never thought there was a chance of a death penalty verdict even though he signed the letter to the contrary. Ray also testified that he gave Foreman a written list of reasons why he should not plead guilty at the same time he signed the letter. This list was allegedly in Foreman's possession when he met later with members of Ray's family. However, the list is not available, and the recollection of Ray and his brothers is not clear on the various reasons that were set forth on the list.

Although the precise date is not established by the proof, there was a meeting between Foreman and members of the Ray family at the home of Ray's sister, Carol Pepper, near St. Louis, Missouri.

As is the case with regard to many of the factual issues, the account of this meeting by Foreman differs substantially from the account given by others who were present and testified in this cause. Foreman testified that after Ray decided to plead guilty that he, Foreman, felt that he should explain the situation to members of the Ray family, particularly Jerry and John Ray. Foreman further testified that he explained at the meeting that Ray might get the death penalty, that it was his recommendation that Ray plead guilty, and that the members of the family agreed. John and Jerry Ray contend that Foreman had with him Ray's list of reasons why he should not plead guilty, that the members of the family agreed that he should not plead guilty, and that they did not urge Ray to plead guilty as they were requested to do by Foreman. This Court concludes that it is not necessary to resolve every factual facet of that meeting. This Court does find that Foreman did recommend that the members of Ray's family encourage him to plead guilty, but they did not do so. Therefore,

Foreman's efforts and remarks at the meeting did not in any way induce Ray to plead guilty.

After Foreman had indicated an agreement to a plea and a ninety-nine year sentence, the Attorney General directed one of his assistants who had devoted virtually all of his time to the compilation and indexing of evidence in the case to prepare a proposed set of stipulated facts that would form the basis of the guilty plea. This was a very comprehensive narrative of the evidence that the State asserted it could prove. It included the devious and deceptive conduct of Ray, including his use of numerous other names, before and after the death of Dr. King, as well as the evidence that placed him on April 4, 1968, in Memphis and at the boarding house from which the State contended the fatal shot was fired. The resulting set of stipulated facts was presented to Ray, and he and Foreman considered them for days before Ray approved them in modified form. The modifications Ray insisted upon were no more than two, and one of these pertained to the removal of alleged stipulated facts that he took a family to register at the George Wallace headquarters in Los Angeles. Ray did not challenge in public or private the stipulations that named him the murderer.

These stipulations constitute a substantial portion of the guilty plea hearing on March 10, 1969. Ex. 87. At that hearing Ray specifically stated that he agreed with the stipulations. However, he specifically, calmly, and respectfully spoke up to state that he disagreed with his attorney insofar as he created the impression that Ray agreed with Ramsey Clark, Attorney General of the United States, and J. Edgar Hoover, Director of the F. B. I., who had reputedly stated that there was no conspiracy involved in the murder of Dr. Martin Luther King, Jr. Otherwise, Ray reaffirmed his admission of guilt for this crime.

Ray now testifies that he considered the plea a technical guilty plea and a vehicle to get him out of Memphis, from whence he might attack it.

After he was transported to Nashville, Tennessee, to the state penitentiary, he promptly commenced writing letters. One was to Senator Eastland, United States Senator of Mississippi and Chairman of the Judiciary Committee. In that letter he stated *inter alia* that he did not shoot Dr. King, but that he believed that he was partly responsible. Ex. 132.

He also wrote Judge Battle on March 26, 1969, and requested that he be furnished the services of the Public Defender or another appointed attorney and that his guilty plea be set aside. Ex. 114.

After the guilty plea was accepted, Foreman withdrew the funds from a trust bank account, which he had opened with the $10,000 given him by Huie. Five hundred dollars was given to Jerry Ray, and the balance was kept by Foreman to apply upon the expenses he had incurred during the four months of his representation.

■ Jerry Ray and John Ray testified that Foreman was boastful and overbearing. Jerry Ray testified that Foreman told Jerry Ray to call him "The Texas Tiger." The fact that Foreman was a braggart, that he used gross exaggeration, and that he was sometimes arrogant and overbearing is established by the proof. He admitted that he probably used words such as "barbecue" or "burn" for the death penalty when talking to Ray and his brothers. However, it is not a deprivation of constitutional rights for a lawyer to speak the language thought to be best understood by a repeated felon who had spent many years in prison, who was willing to fire lawyers or refuse their services, and who was holding back and lying to his lawyer.

Proof offered in the hearing included the results of Intelligence Quotient tests

given Ray at the state penal institution. His overall I.Q. was in the bright normal range with a very superior score in the area of manual dexterity. From other proof, the Court finds that Ray attempted to second-guess those with whom he had contact after he was catapulted into a position of international fame. He sometimes held back, and he sometimes lied. He undertook to make judgments which were better left to others, i. e., he asserts that he was not concerned about the jury giving him the death penalty because Richard Nixon and George Wallace got 70 percent of the vote in Shelby County in the 1968 election, there would not be many blacks on the jury panel, and most of them could be stricken.

Ray realized that some people would be sympathetic with him because he was the accused murderer of Dr. Martin Luther King, Jr. In furtherance of this realization he pursued a relationship with J. B. Stoner, even though Hanes had told him that if Ray insisted on having Stoner associated with Hanes in the criminal case that he, Hanes, would not continue to represent Ray.[2]

In spite of attempts by his lawyers to explain to Ray that he was mistaken, Ray apparently operated on the assumption that he was not guilty of murder if it could be established that he was not the sole participant. This concept is a thread that runs through the entire account by Ray. He told Huie, Hanes, and Foreman of his acting upon the direction of others, but none of them could corroborate Ray's version of other participants in spite of an extensive investigation in this regard. After the guilty plea Ray told Dr. McCarthy DeMere, who attended him in Memphis, that he wasn't by himself in this thing. As indicated above, he wrote to Senator Eastland and indicated he

was partially responsible for Dr. King's death even though he contended that he did not pull the trigger.

Factual allegations (4) through (9) on page 288 of the Court of Appeals remand opinion pertain to the relationship between Ray and Foreman. For the most part they are *not* established by the proof.

Item (4) asserts that Ray asked Foreman to associate a Tennessee lawyer and that Foreman said he would associate John J. Hooker, Sr. of Nashville, Tennessee.[3] Actually, it was Foreman who suggested this. Foreman testified that he was prepared to associate Hooker but that Ray would not approve because he had learned that John Jay Hooker, Jr., a prominent and high-ranking member of the Democratic party in Tennessee, was an admirer of Dr. King. Without resolving whether Ray disapproved, the Court notes that Mr. Hooker, Sr. was not associated. However, it must be remembered that from the time Foreman was retained by Ray in November, 1968, until late January and early February, 1969, there was no money. Furthermore, in December, 1968, the Court appointed the Public Defender, thereby making available experienced counsel who practiced in Shelby County, Tennessee. Additionally the record reflects that Professor Joe Moore of the Memphis State University Law School furnished a limited amount of advice to Foreman on Tennessee Law. Exs. 143, 144.

■ Allegation (5) asserts that despite the urgings of Ray, Foreman refused to take any actions to halt adverse pretrial publicity. This contention, particularly with regard to the "urgings of Ray," was not established by the proof. This pretrial publicity had subsided by the time Foreman was hired by Ray.

2. J. B. Stoner is an attorney from Savannah, Georgia, who is an avowed white supremacist. Stoner signed a letter he wrote to Ray, "Yours for Christ, Race, and Nation." Ex. 127.

3. John J. Hooker, Sr. is now deceased. He was an outstanding member of the bar of Tennessee.

Item (6) refers to Exhibit 47, which is a letter written by Foreman to Ray, in which he set forth his "analysis." Receipt of it was acknowledged by the signature of Ray. Although it does refer to the first two articles in *Look* magazine, it does not contain a "waiver of any claim against Huie or *Look* magazine."

█ Factual allegation (6) also contains the assertion that Foreman told Ray that it would be to his best interest to plead guilty even if he had not committed the crime, for the five reasons given. This Court finds that Foreman did not believe that Ray had not committed the crime. Therefore he did not tell him to plead guilty even if he did commit the crime.

With regard to the five reasons for pleading guilty, the Court finds that Foreman did convey to Ray the fact that he might be better off financially if he pleaded guilty, but this was not a compelling factor to Ray in his decision to plead guilty. Ray testified that he never expected to get any money out of the Huie agreement. He merely wanted funds with which to hire necessary lawyers.

The second alleged reason in item (6) was that John J. Hooker would be the next governor of Tennessee, and he would pardon Ray within two or three years. This was not said. Furthermore, Ray's conduct after the plea certainly belies his reliance on that as a reason for pleading guilty. If Foreman had said this, it would have been in early 1969. The election was not scheduled until 1970, and Ray started repudiating his guilty plea in March 1969.

The third, fourth, and fifth reasons that Foreman allegedly gave Ray to persuade him to plead guilty are all denied by Foreman and are not in any way corroborated by other proof. The Court finds that they are not established by the proof.

Item (7) of the factual allegations asserts that neither Foreman nor Hanes made any active investigation of the case. Counsel for the petitioner have undertaken to establish this by attacking the thoroughness of Hanes and Foreman with regard to certain circumstances as set forth in the extradition proceedings and the stipulations used at the guilty plea hearing, i. e., the lack of more positive proof from the F. B. I. ballistics expert and the lack of credibility of a witness for the State who allegedly saw Ray in the vicinity of the bathroom of the boarding house from which the fatal shot was allegedly fired.

The proof shows that Hanes and Foreman also knew of these weaknesses, but they are by no means of the sensational nature which would explode the State's case, particularly in the light of the substantial incriminating evidence pertaining to Ray's presence in Memphis on April 4, 1968, and his carefully contrived concealment and flight after the murder.

Furthermore, on cross examination the firearms expert offered by the petitioner in this Court to belittle the F. B. I. expert was shown to have made a basic oversight in his calculations, which seriously diminished his reliability as an expert.

█ This Court finds that the investigations made or caused to be made by Hanes and Foreman were well above the minimum standards required of attorneys in Beasley v. United States, 491 F.2d 687 (C.A.6, 1974).

█ Items (8) and (9) of the factual allegations set forth in the remand opinion pertain to the two separate letters written by Foreman on March 9, 1969, in which he agrees to limit his fee and expenses to $165,000 and to advance Jerry Ray $500, provided that Ray did not engage in "unseemly conduct" and "embarrassing circumstances did not take place" in Court at the time of the guilty plea. Exs. 11A and 11B. As heretofore noted, this fee of Foreman was very contingent, and it has not produced any money above $10,000 so far. The amount of the fee, if there were money to pay it, would be *unreasonable.*

The conditions pertaining to the conduct expected of Ray was Foreman's frank and arrogant manner of dealing with a repeated criminal who was given to firing lawyers and trying to regulate or manipulate matters as he saw fit. This abrupt manner by Foreman might be inappropriate in the ordinary lawyer-client relationship, but it was not a violation of Ray's constitutional rights in view of his attitude and conduct towards his lawyers.

 In the order on the preliminary hearing of June 24, 1974, the Court set forth two additional factual issues from the remand opinion which should be resolved at the hearing. Number (10) was taken from a portion of the opinion found on page 290. Did Ray believe at the time he pleaded guilty that he had no other choice? The Court of Appeals opinion suggests that the alternatives open to Ray were to plead guilty with no embarrassing circumstances on the one hand, or that "he could have gone to trial with the reasonable belief, if the contentions are accurate, that a fair hearing would be impossible." As noted above, most of the contentions set forth in items (1) through (9) of the opinion were not true. Furthermore, insofar as the "belief" referred to in the second alternative must be a "reasonable" one, this Court finds that it was not reasonable to eliminate the Public Defender as a means of getting a fair trial. Pursuant to the directions of Judge Battle, made in the presence of Ray, the Public Defender had investigators take statements and otherwise caused preparations to be made for a trial. Based upon the testimony of Hugh Stanton, Jr. at the evidentiary hearing in this cause, the Public Defender's Office would have been ready for trial on April 7, 1969. As previously noted herein, Ray wrote Judge Battle soon after the guilty plea and asked that the Public Defender represent him in setting aside the guilty plea. For the above reasons this Court finds that Ray did not reasonably believe he had no other choice than the guilty plea.

Item (11) of the factual issues taken from the remand opinion was found in footnote 4 on page 291: whether or not the various publications of William Bradford Huie produced a substantial sum of money and what was the distribution of monies? As previously noted, the gross royalties from Huie's work were approximately $67,000, of which his agent got 10 percent. Hanes and Foreman got $40,000, and against the remainder must be applied all of the many expenses attributable to the investigations and literary work produced by Huie.

Other issues raised by the contentions of the petitioner pertain to the manner in which Ray was incarcerated and the surveillance of him during his stay in the Shelby County Jail from July 19, 1968, until after the guilty plea on March 10, 1969.

After Ray was captured in London, a whole cell block was prepared for him in the Shelby County Jail. During his confinement guards were with him at all times. Closed circuit television cameras were available for monitoring his every move at all times. A log was kept by the guards, which recorded all visitors and incoming and outgoing correspondence. Exs. 44, 45, 46. A special set of instructions was prepared for the guidance of those persons who had responsibilities for Ray's care and confinement. Exs. 26 and 27. Pursuant to this procedure the guards or other jail officials were directed to screen the mail, except correspondence with the attorneys. Copies of Ray's correspondence were to be furnished to Lloyd A. Rhodes, the Administrative Assistant to the Shelby County Attorney General.[4] Additionally the guards sometimes screened the trash from Ray's cell and turned it over to their superiors. This produced some

4. There is no proof to suggest that the Administrative Assistant to the Attorney General was assigned duties directly concerned with the trial of Ray.

notes which Ray apparently had prepared for his use in talking to his attorney. Exs. 69 and 70. Among the letters copied was one to the attorney, J. B. Stoner, whom Ray had contacted through his brother about the possibility of suing *Life* magazine for libel, based upon an article about Ray. Ex. 64.

There is also an allegation that the conditions of Ray's incarceration prevented him from discussing his defenses with his attorneys privately, and that it was possible for their conversations to be monitored. However, neither Ray's testimony in this cause nor that of the attorneys supports the inability of Ray to communicate with his attorneys, and there is no showing that any communications between Ray and his attorneys were intercepted to his prejudice.

Counsel for the petitioner argue that the very existence of these screening procedures and the fact that Ray's letters, including the one to Stoner about a civil matter, were reproduced, justifies or requires that a writ of habeas corpus should issue and that the State of Tennessee is barred from trying him again. This Court disagrees: While some of the procedures lacked propriety and were potentially prejudicial, there is nothing to show that the rights of Ray were in fact compromised in the circumstances. Furthermore, it must be remembered that the Sheriff of Shelby County was responsible for the safety of the prisoner and for taking necessary precautions to prevent his escape.

The contentions of Ray also include an assertion that the manner of Ray's confinement in the Shelby County Jail affected his health to the extent that his capacity to resist pressure from Foreman and Huie to plead guilty were vitiated. At the hearing Ray did testify that his belief that his health was deteriorating was a factor in his guilty plea. However, upon consideration of the total record, this contention is based upon an unfounded belief at the time or it is another after-the-plea exaggeration of the circumstances made in attempt to set aside the verdict. Not only is the poor health of Ray not corroborated, but also the proof is to the contrary. Dr. McCarthy DeMere, who is a licensed lawyer as well as a practicing physician, was assigned the task of examining Ray upon his arrival in the Shelby County Jail and attending him during his stay there. Dr. DeMere testified at the hearing in this cause. His testimony indicated that Ray was in better health when he left the Shelby County Jail than when he arrived, and that he was not depressed. Ray's complaints included headaches, which were remedied with aspirin; nosebleeds from plastic surgery, which Ray had in California before the murder in order to change his appearance; and the continual light in his cellblock, which the doctor recommended should be remedied with blinders if necessary.

Counsel for Ray now argue that Dr. DeMere's testimony is impeached because he was a brother-in-law of the trial prosecutor and because the doctor's testimony, based upon his recollection, indicated that he saw Ray more often than the visitors' log actually reflects.

This Court finds that the total proof establishes that there is no basis for the contention that the manner in which Ray was incarcerated in the Shelby County Jail caused a deterioration of his health which in turn caused or contributed to an involuntary and therefore unconstitutional guilty plea.

As previously indicated, one of the constitutional issues in this case concerns the Sixth Amendment right to effective assistance of counsel. Three days after the Court of Appeals for the Sixth Circuit filed its remand opinion in this case, that Court filed its opinion in Beasley v. United States, 491 F.2d 687 (C.A. 6, 1974). In the Beasley case the Court reviewed numerous opinions of the Supreme Court of the United States which considered the Sixth Amendment right to counsel, and in view of those holdings the Court of Appeals for the Sixth Circuit joined the Courts

of Appeals for the Fifth and District of Columbia Circuits and abandoned the "farce and mockery" standard for testing Sixth Amendment claims. In the Beasley case the Court said:

We hold that the assistance of counsel required under the Sixth Amendment is counsel reasonably likely to render and rendering reasonably effective assistance. It is a violation of this standard for defense counsel to deprive a criminal defendant of a substantial defense by his own ineffectiveness or incompetence. (Citations omitted.) Defense counsel must perform at least as well as a lawyer with ordinary training and skill in the criminal law and must conscientiously protect his client's interest, undeflected by conflicting considerations. Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942); McMann v. Richardson, 397 U.S. 759, 771, 90 S. Ct. 1441, 25 L.Ed.2d 763 (1970). Defense counsel must investigate all apparently substantial defenses available to the defendant and must assert them in a proper and timely manner. (Citations omitted.)

. . . If, however, action that appeared erroneous from hindsight was taken for reasons that would appear sound to a competent criminal attorney, the assistance of counsel has not been constitutionally defective. McMann v. Richardson, 397 U.S. 759, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970). 491 F.2d page 696.

The Court of Appeals noted seven findings of the District Court pertaining to the competency and effectiveness of the attorney for Beasley and held that the judgment of conviction should be vacated because Beasley's Sixth Amendment rights were violated. Five of the seven findings pertained to trial strategy including the failure to call res gestae witnesses and obtain and produce fingerprint evidence. Two of the findings relied upon by the Court of Appeals pertained to the effectiveness or competency of the pretrial investigation. In that case the attorney failed to interview any res gestae witnesses other than the one who gave mildly favorable testimony for the prosecution. Furthermore, counsel conducted no more than a cursory investigation of the facts prior to trial and deprived the defendant of the testimony of an alibi witness.

In the instant case the investigation by Huie, Hanes, Hays, the staff of the Public Defender, and Foreman was substantially more than pro forma. These investigations enlightened the respective attorneys with regard to the lack of conclusive proof in the matter of the F.B.I. ballistics report and the identification of Ray by the alleged eyewitness Charles Quitman Stephens, including Mr. Stephens' fondness for the fermented grape. In this case the petitioner Ray has failed to establish that the investigation was inadequate and that the performance of Hanes and Foreman was not at least of the caliber of a lawyer with ordinary training and skill in criminal law.

With regard to advice given by an attorney, which results in a guilty plea, the burden is upon the person who attacks the plea to establish that the advice was not within the range demanded of attorneys in criminal cases. Stout v. United States, 508 F.2d 951 (C.A. 6, decided 1–10–1975). In the instant case Ray has not met that burden with regard to the advice given by Foreman.

The Beasley tests on effectiveness of counsel also require that the interest of the client must be undeflected by conflicting considerations. In this regard the Court cited Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942) and McMann v. Richardson, 397 U.S. 759, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970).

Glasser is a case in which a new trial was required because the defendant Glasser was deprived of effective assistance by virtue of the fact that a conflict arose in the dual representation by his attorney of him and another defendant in the case.

The McMann case is one of a trilogy of cases involving the constitutionality of judgments and sentences based upon guilty pleas. These cases were all decided May 4, 1970. Brady v. United States, 397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed.2d 747; McMann v. Richardson, 397 U.S. 759, 90 S.Ct. 1441, 25 L.Ed.2d 763, and Parker v. North Carolina, 397 U.S. 790, 90 S.Ct. 1458, 25 L.Ed.2d 785.

Those cases hold that a guilty plea is not rendered involuntary merely because it was induced by a defendant's desire to limit the possible maximum penalty or fear of the death penalty. The cases also hold that guilty pleas may not be set aside because counsel who advised the guilty plea did not anticipate a future holding of the Supreme Court which might have altered the advice. Therefore the fact that the State of Tennessee indicated an intention to seek the death penalty against Ray and that the death penalty was later declared unconstitutional does not in and of itself entitle Ray to a writ of habeas corpus.

Those three cases reiterate the basic constitutional requirements for guilty pleas, namely, that they must be voluntarily and intelligently given. If a defendant did not have competent counsel or was not given competent advice and thereby was caused to plead guilty, then his plea was not intelligently made.

The voluntariness standard may be violated by coercion in the form of impermissible pressure of counsel on his client to plead guilty. This was an unproven contention in Brady v. United States, *supra.*

Additionally a guilty plea may be attacked upon the basis that it was not voluntarily given because the defendant's attorney had a conflict of interest. Ray v. Rose, 491 F.2d at page 290, citing Dukes v. Warden, 406 U.S. 250, 92 S.Ct. 1551, 32 L.Ed.2d 45 (1972). The latter case is one in which there was an alleged but not established conflict of interest based upon a dual representation by lawyers in the same firm.

This Court is of the opinion that the petitioner Ray has not shown that his assistance from counsel was below the minimum standards. The record also shows that Ray's guilty plea otherwise was intelligently given in all respects as required by the constitutional standards.

On the issue of voluntariness the Court finds that the guilty plea of Ray was not coerced by impermissible pressure by Foreman. On the contrary, the matter was discussed on numerous separate occasions over almost one month at the least. Ray carefully considered and partially amended the lengthy stipulation of facts that formed a basis for accepting his guilty plea, and Ray coolly and deliberately entered the plea in open court where he spoke to correct the record as he thought appropriate.

The conflict of interest issue that challenges the voluntariness of the plea centers around the contract between Huie, Hanes, and Ray that was negotiated by Hanes while representing Ray. As indicated previously herein, Foreman replaced Hanes as a party to the contract as amended. Both the nature of the contract and the amount payable to Foreman were noted in the opinion of the Court of Appeals in an earlier case wherein Ray sought injunctive and declaratory relief against Foreman, Hanes, and Huie by attempting to have the contracts voided. Ray v. Foreman, 441 F.2d 1266 (C.A. 6, 1971). The dissenting opinion in that case noted the probability that the contracts involved violated the fiduciary duty imposed upon attorneys in their dealings with their clients.

Hanes made a full disclosure of the contents of all contractual provisions into which he caused an agreement to be executed on his advice whereby his financial interest might be in conflict with Ray's best interests in his defenses in the criminal trial. Furthermore, the in-

formation required to be given by Ray to Huie and other information to which it led by virtue of Huie's investigation was subjected to the scrutiny of a grand jury before the scheduled trial date of Ray. Ex. 36.[5] This resulted in Huie being listed by the prosecution as a potential witness for the State when Ray was to be tried. Ex. 39.

The contract negotiated by Hanes is an apparent violation of Disciplinary Rule 5–104(B) of the Code of Professional Responsibility of the American Bar Association, which was adopted August 12, 1969, to become effective on January 1, 1970.[6] Furthermore, as this Court noted previously herein, if Foreman had been able to collect the agreed amount of the fee, namely $150,000, this Court is of the opinion that the fee would have been unreasonable. In the opinion of this Court, it would have been subject to an attack limiting the amount of the fee to a recovery based upon a *quantum meruit*. Planters' Bank et al. v. Hornberger et al., 44 Tenn. 531, 577 (1867).

However, based upon the total proof, the irregularities of the attorneys Hanes and Foreman and the potential and limited actual conflicts of interest did not cause Ray to plead guilty involuntarily. By Ray's own testimony he was not concerned about money except insofar as it was necessary to provide funds for his various successive court proceedings. Furthermore, there is no proof to show that sizeable monies were forthcoming or that the various persons involved were reasonably entitled to anticipate the receipt of sizeable sums of money by virtue of a guilty plea. Additionally there is nothing to suggest that Ray was persuaded to plead guilty on March 10 to meet a publication deadline. Such was not the case.

In their post hearing memorandum counsel for the petitioner strongly urge upon the Court a violation of Ray's constitutional rights based upon the manner of Ray's incarceration in the Shelby County Jail and the interception of his writings. As previously noted, counsel assert that this is of sufficient basic impropriety that Ray should be ordered released and no longer subject to trial for the murder of Dr. King.

This Court is of the opinion that counsel place an erroneous reliance upon a portion of the opinion in Hoffa v. United States, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966). On page 308, 87 S.Ct. page 416 of that opinion, the Court hypothesized as follows: "It is possible to imagine a case in which the prosecution might so pervasively insinuate itself into the councils of the defense as to make a new trial on the same charges impermissible under the Sixth Amendment." Counsel argue that the Ray case is such a case. This Court does not agree. The potentially prejudicial interceptions of information that were implicit in the manner of Ray's incarceration did not cause any actual prejudice. Furthermore, there is no proof to show that any intercepted matters caused or contributed to the guilty plea.

In Tollett v. Henderson, 411 U.S. 258, 93 S.Ct. 1602, 36 L.Ed.2d 235 (1973) the Supreme Court said on page 267, 93 S.Ct. on page 1608:

> We thus reaffirm the principle recognized in the Brady trilogy: a guilty plea represents a break in the chain of events which has preceded it in the criminal process. When a criminal defendant has solemnly admitted in

---

5. Although the subpoena was a *duces tecum*, Huie did not produce the actual writings received by him from Ray because he did not have them in his possession at the time.

6. Disciplinary Rule 5–104 is entitled "Limiting Business Relations with a Client." Subsection (B) provides: "Prior to conclu-

sion of all aspects of the matter giving rise to his employment, a lawyer shall not enter into any arrangement or understanding with a client or a prospective client by which he acquires an interest in publication rights with respect to the subject matter of his employment or proposed employment."

open court that he is in fact guilty of the offense with which he is charged, he may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea. He may only attack the voluntary and intelligent character of the guilty plea by showing that the advice he received from counsel was not within the standards set forth in McMann.

This Memorandum Decision represents this Court's findings of fact and conclusions of law on the issues raised by the proof and in the light of the Court of Appeals remand opinion directing an evidentiary hearing. This Court considered that the objective of the hearing was to determine whether the constitutional rights of James Earl Ray were violated in the Criminal Court of Shelby County, Tennessee, in light of the *total* circumstances.

Although the circumstances include conduct on the part of Ray's retained attorneys that should have been performed differently, the total circumstances do not reflect a violation of the constitutional rights applicable to one who voluntarily pleaded guilty on the advice of competent counsel of his own choosing.

The Sixth Amendment to the Constitution guarantees to every defendant in a criminal trial "the Assistance of Counsel for his defence." The Supreme Court of the United States has determined that the constitutional rights set forth in the Sixth Amendment and the other amendments constituting the Bill of Rights are guaranteed to persons charged with crimes in the courts of the various states by virtue of the Fourteenth Amendment to the United States Constitution. The scope of the proper inquiry by the state, acting through the trial court judge or otherwise, into the relationship between a defendant accused of a crime and his counsel, of necessity must have limitations. Otherwise, the actions of the state are subject to attack for interference with the constitutional right to private conferences between the client and his attorney.

For the reasons set forth above, this Court finds that the Sixth Amendment constitutional rights of James Earl Ray were not violated, nor were rights under any other amendment of the United States Constitution violated.

Therefore, the Clerk of the Court is hereby directed to enter a separate judgment denying the petition for a writ of habeas corpus.