James Earl RAY, Petitioner-Appellant,

v.

J. H. ROSE, Warden, Respondent-Appellee.

No. 75–1795.

United States Court of Appeals, Sixth Circuit.

Argued Feb. 3, 1976.
Decided May 10, 1976.

James Hiram Lesar, Bernard Fensterwald, Jr., Washington, D. C., Robert I. Livingston, Memphis, Tenn., for petitioner-appellant.

R. A. Ashley, Atty. Gen. of Tennessee, William J. Haynes, Jr., Nashville, Tenn., for respondent-appellee.

Before PHILLIPS, Chief Judge, and CELEBREZZE and MILLER,* Circuit Judges.

PER CURIAM.

James Earl Ray appeals from the denial of his petition for habeas corpus following an evidentiary hearing in the district court. Two primary constitutional issues were raised at the hearing and are before us on appeal: (1) whether Ray received effective assistance of counsel in the state criminal proceeding in which he was indicted for the murder of Dr. Martin Luther King, Jr., and (2) whether Ray intelligently and voluntarily pleaded guilty to the charge.

Ray entered his plea of guilty to the charge in the Criminal Court of Shelby County, Tennessee, on March 10, 1969. Judge Preston Battle, after carefully advising Ray as to the consequences of his plea and meticulously examining him as to whether the plea was voluntarily and understandingly made, accepted the plea and imposed a sentence of 99 years imprisonment—a sentence agreed upon after plea bargaining. Immediately thereafter, Ray wrote to Judge Battle and requested permission to withdraw his plea and to stand trial. Judge Battle died on March 31, 1969, without acting on Ray's request. Ray unsuccessfully sought post-conviction relief in the state courts. His habeas corpus petition filed in the United States District Court for the Middle District of Tennessee was denied without evidentiary hearing. *Ray v. Rose,* 373 F.Supp. 687 (M.D.Tenn.1973). This

---

* Judge Miller concurred in this opinion prior to his death on April 12, 1976.

Court, *Ray v. Rose,* 491 F.2d 285 (6th Cir.), *cert. denied,* 417 U.S. 936, 95 S.Ct. 2650, 41 L.Ed.2d 240 (1974), reversed the district court and remanded the case for a "full-scale judicial inquiry" into Ray's allegations.

The facts in this case are set forth in detail in the district court's opinion concluding that Ray was not entitled to relief and dismissing the petition. *Ray v. Rose,* 392 F.Supp. 601 (W.D.Tenn.1975).[1] Therefore, we will undertake to summarize only those facts pertinent to the two primary issues before us.

Dr. King was assassinated in Memphis on April 4, 1968. Ray's indictment for the slaying followed on May 7, 1968. He was arrested in London on June 8, 1968, and was returned to Memphis on July 19, 1968.

While Ray was awaiting extradition in London, he contacted attorney Arthur Hanes of Birmingham, Alabama, and asked Hanes to represent him. Before Hanes visited Ray, Hanes was contacted by William Bradford Huie, a writer, about the possibility of Ray's selling his story to finance his defense. Hanes and his son, Arthur Hanes, Jr., also an attorney, met with Ray in London in July, 1968. On July 5, 1968, Ray signed two agreements on the advice of Hanes. One of these gave Hanes complete power of attorney to act for Ray. The other, furnished by Huie, assigned to Hanes 40% of all monies that Ray would receive as a result of a subsequent agreement with Huie and gave Hanes authority to act as exclusive agent and attorney for Ray in handling of contracts, negotiations, and other matters relating to sale of any information.

After extradition,[2] Hanes, Huie, and Ray entered into an agreement dated July 8,

1968, whereby Huie was given exclusive rights to receive information on Ray's participation in the King assassination. The agreement stated that its purpose was to establish the truth regarding the assassination. It provided that Hanes and Ray would each receive 30% of gross receipts of all literary works while Huie would receive 40%. Huie also was given power to execute contracts for the sale of his book and other rights to Ray's story. Huie agreed to furnish, at quarterly intervals, statements reflecting all transactions and to give Ray and Hanes copies of all contracts entered into by him. The district court found that Huie did not .comply with either of these two latter provisions. The agreement was accompanied by a letter from Huie dated July 8, setting forth a schedule of cash payments to be made to Hanes and Ray until Ray had been in jail five months. Ray and Hanes both indicated that they entered into these agreements to provide funds for Ray's defense.

In September 1968, at Ray's request, the July 5 agreement between Hanes and Ray whereby Hanes was to receive 40% of the money Ray received from Huie was amended to limit the amount to be received by Hanes to $20,000. Ray testified that he made the request in order to have funds to appeal the case or to institute post-conviction proceedings.

After the three-party agreement was entered into, Huie signed a contract with Cowles Communications, Inc., to write a series of three articles about Ray for *Look* magazine. This contract was amended by an instrument dated March 17, 1969, to reduce the monetary value of the Ray story because of Ray's guilty plea. The district court found that, despite the date of the

---

1. Because the court ruled on remand that Federal Rule of Civil Procedure 45 applied to the case and that subpoenas would therefore not be issued to persons living outside the district more than 100 miles from the place of hearing, Percy Foreman, Ray's second attorney, and William Bradford Huie, a writer with whom Ray and his attorneys had entered into various contracts, and several other important witnesses did not testify at the hearing. However,

Foreman and Huie gave depositions prior to the hearing. This ruling of the district court also meant that Ray had to rely on voluntary compliance with discovery orders to a large extent. Most of those persons to whom such orders were issued did not voluntarily comply.

2. Hanes and Huie signed the three-party agreement on July 8. Ray did not execute the agreement until August 1, 1968.

amendment, it was drafted prior to the plea because the amendment stated that it was expected that Ray would plead guilty on or about March 10. The amendment also provided that Huie would obtain from Hanes and Percy Foreman, Ray's second attorney, articles of 1000 words for which Cowles would pay them each $1000. The first two articles under this contract appeared in *Look* in November 1968.[3] The third *Look* article was published in April, 1969, along with the articles by Hanes and Foreman.[4]

Huie also entered into a contract with Dell Publishing Company regarding the publication of a non-fiction book. By the terms of the agreement, Dell could publish the book no sooner than four weeks after the last *Look* article or, at the latest, on or after March 5, 1969. This agreement was also amended after the guilty plea was entered to reduce the amount to be paid by *Look*. The Dell contract provided that no proceeds could be used directly or indirectly for Ray's benefit. Huie was either unaware of this provision or was ready to violate it when the book produced any royalties. Ray did not know of either the Cowles or Dell contract until the hearing in district court.

Because of restrictions on who could visit Ray in the Shelby County jail, Huie obtained his information by an exchange of letters or from a list of questions by Huie which Ray would answer in his own handwriting. First Hanes and later Foreman carried the information and questions back and forth between Huie and Ray. Huie made an investigation to verify much of the information he received from Ray. Although Huie gave information from his investigation to Ray's attorneys, the attorneys did not consider Huie a hired investigator for Ray's defense. The district court found that Hanes hired a private investiga-

tor named Renfro Hayes to do the investigatory work which Hanes and his son did not do and thus rejected Ray's allegation that Hanes refused to hire a private investigator. Huie promised that he would not publish before Ray's trial anything about Ray's activities in the latter part of March, 1968, and Ray testified at the hearing that Huie kept the promise.

The district court also rejected several of Ray's allegations in regard to Hanes' representation of Ray by finding that: (1) Hanes did not refuse to request a continuance because the contract with Huie provided that Ray must go to trial within a certain number of days, (2) Hanes did not reject Ray's desire to testify or state that Ray's testimony would reveal information which could be sold, and (3) Hanes did not allow Huie to dictate the manner in which the criminal case would be tried.

Toward the end of Hanes' representation of Ray, Ray's brother Jerry visited Huie in Huntsville, Alabama, and erroneously reported to James Earl Ray that Huie was trying to bribe James Earl not to take the stand. The district court found that Ray never seriously considered taking such a bribe and that, in any event, the alleged bribe was not a factor in the guilty plea.

Trial for Ray was set for November 12, 1968. On November 10, 1968, Ray fired Hanes because, as he testified, he felt Hanes was working for Huie and not for Ray. Ray's brothers and Percy Foreman, a well-known Texas attorney, who had come to talk to Ray at the instance of Ray's brothers, both urged Ray to fire Hanes. At the time Hanes was fired, Ray hired Foreman to handle his defense. At the time he was hired, Foreman took the position that he would not get involved with Huie or any other writers until after the trial.

---

3. When the articles were written, it was thought that the trial would begin November 12, 1968.

4. Hanes' article was entitled "For Conspiracy" and Foreman's article was "Against Conspiracy." Both attorneys contended that the articles as published differed considerably from the drafts they had written. Huie's first two

articles indicated that he felt that a conspiracy to kill King existed while his third article indicated that he believed Ray had acted alone. There is evidence that Ray believed that the Huie articles were damaging to his case. Hanes, however, regarded this publicity as favorable because the first two articles furthered the conspiracy theory.

Foreman obtained a continuance to prepare for trial and the case was re-set for March 3, 1969. Later, Foreman advised the court that he could not be ready for trial on that date. The court refused to change the date and ordered the public defender to be ready to take over the defense if necessary. Ray did not approve the appointment and refused to talk to the public defender. Later Foreman obtained a continuance until April 7.

The court found that Foreman did fail to associate experienced Tennessee counsel in the case as Ray alleged, but considered this irrelevant since the public defender's appointment made experienced local counsel available; furthermore, a Memphis State University Law School professor gave Foreman some advice on Tennessee law and there was no money to hire other counsel. The court also found that Foreman did not refuse to attempt to halt adverse pretrial publicity despite Ray's urgings. Rather, the court found that the publicity had tapered off when Foreman entered the case and that Ray did not urge Foreman to take action in this regard.

Two days after Foreman was hired, he had Ray sign over to him the alleged murder weapon and a white Mustang found in Atlanta. By an agreement dated December 6, 1968, and signed by Ray on January 29, 1969, Hanes was released from the contract with Ray and Huie and Ray was given Hanes' 30% share. On February 3, 1969, Ray assigned all of his rights to the Huie proceeds to Foreman. On March 9, 1969, the day before the guilty plea, Foreman reassigned to Ray all the royalties due from Huie in excess of $165,500 [5] "if the plea is entered and the sentence accepted and no embarrassing circumstances take place in the court . . . ."

There was considerable conflict in the proof as to when Foreman first discussed the possibility of a guilty plea with Ray and the court did not make any findings as to

the time of such discussions. The court did, however, find that Foreman wrote a letter to Ray dated February 13, 1969, which contained an analysis of the case and Foreman's recommendations. In the letter Foreman expressed his opinion that there was a "little more than a 99 per cent chance" of a death penalty verdict and a "100 per cent chance of a guilty verdict." He also stated in the letter that he would consider it "one of the great accomplishments" of his career if he could save Ray's life by a negotiated plea. Foreman had Ray acknowledge receipt of the letter by signing a copy of it, but Ray did not sign the letter until sometime after the day it was delivered.

The court found that most of Ray's allegations regarding Foreman's inducement of the guilty plea were not supported by the proof. Specifically, the court found that Foreman did not advise Ray, even if innocent, to plead guilty; that Foreman suggested to Ray that Ray would be better off financially with a guilty plea, but that this statement did not influence Ray in his decision; that Foreman did not advise Ray to plead guilty because he would be pardoned by John J. Hooker, Jr., who would be the next governor of Tennessee; and that Foreman did not attempt to persuade Ray to plead guilty by telling him that the prosecution was prepared to bribe a key witness against Ray, by saying that Foreman would exercise less than his best efforts if Ray insisted on a trial, or by telling Ray that Judge Battle would not allow him to change attorneys and that Foreman would not withdraw. In addition, the court found that Foreman's advice did not cause Ray reasonably to believe that he had no alternative to a guilty plea since he could have gone to trial with the public defender.

By letter to Foreman dated February 18, 1969, Ray gave Foreman written authorization to negotiate a guilty plea for a term of years. The letter was drafted and prepared

---

5. According to Foreman, the $165,500 included $150,000 for his fee, $15,000 for expenses, and $500 for a cash advance to Jerry Ray, James Earl Ray's brother for the purpose of hiring a new attorney for James Earl. The district court found that the fee would be unreasonable if there were money to pay it.

by Foreman for Ray's signature. The letter stated that Foreman and Ray agreed that it was impossible to controvert certain incriminating facts and believed that a trial would result in a guilty verdict with a sentence of life, ninety-nine years, or the electric chair. Ray testified that he did not believe that there was a chance of the death penalty even though he signed this letter. He also testified that when he signed the letter, he gave Foreman a written list of reasons why he should not plead guilty. The district court did not make a finding as to whether the list actually existed.

The district court found that Foreman met with members of Ray's family and urged them to encourage Ray to plead guilty, but that they did not do so. Therefore, the court said, Foreman's conduct in this regard did not induce the guilty plea. The court also found that Ray's health did not deteriorate while he was in the Shelby County jail to the extent that he was unable to resist pressure to plead guilty.

After Foreman and the Attorney General had agreed to a guilty plea, the Attorney General's office prepared a set of stipulations representing those facts which the state said it could prove. Among the stipulations was one which stated that Ray had fired the shot which killed Dr. King. Ray approved these stipulations in slightly modified form without any challenge to the stipulation that he had committed the murder. The stipulations were presented at Ray's guilty plea hearing and Ray acknowledged that he agreed with the stipulations. He also stated that he disagreed with Foreman's representation that Ray agreed with Attorney General Ramsey Clark and FBI Director J. Edgar Hoover who had said that there was no conspiracy involved in King's murder.

Huie paid Hanes $30,000 and Foreman $10,000 to be applied to their expenses and fees.[6] Additionally Hanes and Foreman each received $1000 for their articles in *Look*.

Based on testimony of Victor Timkin, general counsel of Bantam Books, the district court found that the guilty plea, in lieu of trial, substantially reduced the amount of prospective income from literary royalties to Ray and his attorneys.

The court rejected Ray's allegation that neither Hanes nor Foreman made any active investigation of the case. It found that both of Ray's attorneys made adequate investigations and were aware of weaknesses in the state's case.

The court found that, while some of the procedures used in screening of Ray's mail, reproduction of his letters, and monitoring of his conversations in jail were improper, they did not prevent him from communicating with his attorneys or cause any actual prejudice to the rights of Ray.

Ray first argues that his guilty plea was not voluntarily and intelligently made because Foreman pressured him into pleading guilty against his will. Ray contends that Foreman made him believe that Judge Battle would not permit him to change attorneys again and, unless he pleaded guilty, he had no alternative but to go to trial with Foreman, whom he could not trust, or the Public Defender, whom he thought incapable of handling a case of this nature. As evidence that the plea was not voluntary, Ray relies heavily upon the March 9 letters from Foreman to Ray agreeing to reassign to Ray all his rights to income under the Huie contracts, conditioned upon the guilty plea being entered "without any unseemly conduct" on Ray's part in court.

■ Considering "all of the relevant circumstances" surrounding Ray's plea, *Brady v. United States*, 397 U.S. 742, 749, 90 S.Ct. 1463, 1469, 25 L.Ed.2d 747, 757 (1970), we agree with the district court that the plea was entered voluntarily and knowingly. As stated, Judge Battle very carefully questioned Ray as to the voluntariness of his plea before it was accepted on March 10,

---

**6.** Huie received $67,000 in gross royalties. He gave 10% to his agent and $40,000 to Hanes and Foreman.

1969.[7] Ray specifically denied at that time that any one had pressured him to plead guilty. His responses and actions in court reveal that he was fully aware of what was occurring.[8] The February 18 letter authorizing Foreman to negotiate a guilty plea supports the finding that the plea was voluntary. Other evidence showed that Ray had pleaded guilty to two prior felonies, that his IQ was in the bright normal range, and that Foreman had carefully explained to him the consequences of his plea. Indeed Ray does not seriously contend on appeal

that he did not understand the nature and consequences of his plea. Nor does he argue that his health deteriorated to such an extent that he was unable to resist pressure to plead guilty or to make an intelligent choice to enter such a plea.

 Acceptance of Ray's arguments in regard to the voluntariness of the plea would require us to reverse findings of the district court regarding the contents of Foreman's discussions with Ray. As we have noted earlier, the court found that Ray simply had not proved that Foreman

---

7. A portion of the exchange between Ray and Judge Battle was as follows:

The Court: You are entering a plea of guilty to murder in the first degree as charged in the indictment as a compromise and settling your case on an agreed punishment of 99 years in the State Penitentiary. Is that what you want to do?

Answer: Yes, I do.

The Court: Is this what you want to do?

Answer: Yes, sir.

The Court: Do you understand that you are waiving which means you are giving up a formal trial by your plea of guilty although the laws of this State require the prosecution to present certain evidence to a jury in all cases on pleas of guilty to murder in the first degree by your plea of guilty you are also waiving . . . [the Court explains Ray's rights in great detail] . . . Has anything besides this sentence of 99 years in the Penitentiary been promised to you to get you to plead guilty? Has anything else been promised to you by anyone?

Answer: No, it has not.

The Court: Has any pressure of any kind by anyone in any way been used on you to get you to plead guilty?

Answer: No, no one in any way.

The Court: Are you pleading guilty to murder in the first degree in this case because you killed Dr. Martin Luther King under circumstances that would make you legally guilty of murder in the first degree under the law as explained to you by your lawyer?

Answer: Yes, legally yes.

The Court: Is this plea of guilty to murder in the first degree with an agreed punishment of 99 years in the State Penitentiary free, voluntarily and understandingly made and entered by you?

Answer: Yes, sir.

The Court: Is this plea of guilty on your part the free act of your free will made with your full knowledge and understanding of its meaning and consequences?

Answer: Yes, sir.

8. After the plea was entered, Ray expressed his opinion that he could not agree with theories that there had been no conspiracy and further reaffirmed his desire to plead guilty in the following exchange:

Ray: Your Honor, I would like to say something, I don't want to change anything that I have said, but I just want to enter one other thing. The only thing I have to say is that I can't agree with Mr. Clark.

Foreman: Ramsey Clark.

The Court: Mr. who?

Ray: Mr. J. Edgar Hoover. I agree with all these stipulations, and I am not trying to change anything.

The Court: You don't agree with whose theories.

Ray: Mr. Canale's, Mr. Clark's and Mr. J. Edgar Hoover's about the conspiracy. I don't want to add something on that I haven't agreed to in the past.

Foreman: I think that what he said is that he doesn't agree with Ramsey Clark that Ramsey Clark is right or that J. Edgar Hoover is right. I didn't argue that as evidence in this case. I simply stated that underwriting the statement of General Canale that they had made the same statement. You are not required to agree with it all.

The Court: You still, your answers to these questions that I asked you would still be the same? Is that correct?

Ray: Yes, sir.

The Court: There is nothing in these questions that I have asked you in your answer to them you change none of them at all. In other words you are pleading guilty to and taking 99 years. I think the main question that I want to ask you is this: Are you pleading guilty to murder in the first degree in this case because you killed Dr. Martin Luther King under such circumstances that it would make you legally guilty of murder in the first degree under the law as explained to you by your lawyer (the defendant indicated in the affirmative). Your answer is still yes? All right sir, that is all you may swear the jury.

made many of the statements attributed to him by Ray in urging him to plead guilty. Further, the court found that Foreman had not succeeded in getting Ray's family to pressure him to plead guilty. Finally, the court found that Ray did not reasonably believe that he had no alternative to a guilty plea. We have carefully examined the record in this case and have determined that these findings of the district court are not clearly erroneous.[9]

In addition, we do not view the fact that Foreman was to receive a certain sum of money under the amended Cowles contract if Ray pleaded guilty as a factor that rendered the plea involuntary. In view of Timkin's testimony that the contracts would have produced more money had the case gone to trial, the fact that the Dell and Cowles contracts themselves were amended to reduce the amounts payable to Huie after the plea, and other evidence indicating that Foreman's motive in urging Ray to plead guilty was avoidance of the death penalty, it seems highly improbable that Foreman was influenced to urge Ray to plead guilty by the prospect of receiving this money. This potential conflict of interest then was not a factor which caused Ray to enter the plea. *See Dukes v. Warden*, 406 U.S. 250, 92 S.Ct. 1551, 32 L.Ed.2d 45 (1972). Further, the evidence does not support any contention that Ray pleaded guilty in order to receive money under the contracts.[10]

In regard to Foreman's March 9 letters, we are unable to view these letters as an indication that the plea was involuntary. Ray argues that he entered this agreement only because he no longer trusted Foreman and needed the money he would receive under the Huie contracts to pay a new lawyer to reopen his case. We have already noted that most of the factual bases of Ray's allegation that Foreman induced him to plead guilty by undermining Ray's trust in his attorney and making Ray believe he had no alternative to a guilty plea were not established at the hearing. Further, Ray's testimony that he pleaded guilty because he anticipated trying to reopen his case at a later date is at best highly implausible. It is more likely that he simply reasoned that a shrewd attorney might find a way to overturn his conviction regardless of the voluntariness of the plea.

We turn to Ray's second major contention on this appeal: that he was denied effective assistance of counsel. The standard in this Circuit for determining whether a defendant has received effective assistance of counsel requires that a defendant have counsel "reasonably likely to render and rendering effective assistance." *Beasley v. United States*, 491 F.2d 687, 696 (6th Cir. 1974). Ray argues that this standard was not met by the attorneys representing him because (1) his attorneys had a conflict of interest depriving him of effective assistance, (2) his attorneys failed to investigate the case adequately, (3) Foreman's advice to plead guilty was incompetent, and (4) Ray's relationship with his attorneys while he was in jail was interfered with by surveillance, mail interception, and delivery of

---

**9.** The clearly erroneous standard is the proper standard for review of factual findings of the district court in a habeas corpus proceeding. *See Monnich v. Knapp*, 408 F.2d 356 (6th Cir. 1969). Moreover, this is the proper standard where the evidence includes depositions and other written evidence, as in the instant case. *See United States Steel v. Fuhrman*, 407 F.2d 1143, 1145–46 (6th Cir. 1969).

**10.** In regard to the effect of the conflict of interest on the guilty plea, the district court said:

"However, based upon the total proof, the irregularities of the attorneys Hanes and Foreman and the potential and limited actual conflicts of interest did not cause Ray to plead guilty involuntarily. By Ray's own testimony he was not concerned about money except insofar as it was necessary to provide funds for his various successive court proceedings. Furthermore, there is no proof to show that sizeable monies were forthcoming or that the various persons involved were reasonably entitled to anticipate the receipt of sizeable sums of money by virtue of a guilty plea. Additionally there is nothing to suggest that Ray was persuaded to plead guilty on March 10 to meet a publication deadline. Such was not the case. 392 F.Supp. at 620."

Ray's mail and privileged attorney-client communications to the prosecution.

The contractual arrangements involving Ray, his attorneys, and Huie clearly placed the attorneys in a potential conflict of interest situation. Further, as the district court pointed out, the contract is a violation of Disciplinary Rule 5–104(B) of the Code of Professional Responsibility of the American Bar Association, which was adopted after Ray entered his plea. Despite our disapproval of such a fee arrangement, however, its existence does not necessarily mean that Ray was denied effective assistance of counsel.

In *Glasser v. United States*, 315 U.S. 60, 68–76, 62 S.Ct. 457, 464–467, 86 L.Ed. 680, 698–702 (1941), the Supreme Court discussed the issue of denial of effective assistance of counsel in a conflict of interest situation. The Court said in *Glasser* that it was unnecessary to determine the precise *degree* of prejudice sustained by the defendant as a result of the conflict of interest. *Glasser, supra* at 75–76, 62 S.Ct. at 467, 86 L.Ed. at 701. However, the opinion, in discussing specific examples of prejudice suffered by Glasser and in concluding that his representation "was not as effective as it might have been" had there been no conflict of interest, makes clear that there must be a showing of some actual prejudice. This Court has so interpreted *Glasser* and has required a showing of actual prejudice in a conflict of interest situation. *See United States v. Berriel*, 371 F.2d 587 (6th Cir. 1967), *cert. denied*, 390 U.S. 907, 88 S.Ct. 830, 19 L.Ed.2d 875 (1968); *United States v. Burkeen*, 355 F.2d 241 (6th Cir. 1966); *Harris v. Thomas*, 341 F.2d 560 (6th Cir. 1965); *Craig v. United States*, 217 F.2d 355 (6th Cir. 1954). Other courts considering situations in which denial of effective assistance of counsel due to a conflict of interest situation has been alleged have similarly required a showing of some actual prejudice. *See United States v. Mari*, 526 F.2d 117 (2d

Cir. 1975); *United States v. Wisniewski*, 478 F.2d 274 (2d Cir. 1973); *United States v. Alberti*, 470 F.2d 878, 881 (2d Cir. 1972), *cert. denied*, 411 U.S. 919, 93 S.Ct. 1557, 36 L.Ed.2d 311 (1973); *Ford v. United States*, 126 U.S.App.D.C. 346, 379 F.2d 123 (1967). *Cf. United States v. Jeffers*, 520 F.2d 1256 (7th Cir.) *cert. denied*, 423 U.S. 1066, 96 S.Ct. 805, 46 L.Ed.2d 656, 44 U.S.L.W. 3399 (1976); *United States v. Nadaline*, 471 F.2d 340 (5th Cir.), *cert. denied*, 411 U.S. 951, 93 S.Ct. 1424, 36 L.Ed.2d 414 (1973). *But see United States ex rel. Hart v. Davenport*, 478 F.2d 203, 210 (3d Cir. 1973) (requiring only a "showing of a *possible* conflict of interest or prejudice, however remote"); *Walker v. United States*, 422 F.2d 374 (3d Cir.), *cert. denied*, 399 U.S. 915, 90 S.Ct. 2219, 26 L.Ed.2d 573 (1970).[11] While we have found no case dealing with precisely the type of conflict of interest involved here, we consider the principles applicable to conflicts of other types apposite here. *Cf. United States v. McCord*, 509 F.2d 334, 352 n. 64 (1974), *cert. denied*, 421 U.S. 930, 95 S.Ct. 1656, 44 L.Ed.2d 87 (1975).

■ After carefully examining the record in this case and the findings of the district court, we conclude that Ray has not sustained his burden of showing that he was prejudiced in any way as a result of the contractual arrangements with Huie. Hanes was mindful that his obligation was solely to represent Ray and the district court's findings indicate that Hanes did not allow Huie to influence his conduct in representing Ray. Nor was Ray prejudiced by certain events which occurred due to the existence of the contracts during Hanes' representation of Ray. These events included the possibly damaging publicity of the Huie articles in *Look*, Huie's testifying before the grand jury about information received from Ray, and Huie's alleged attempt to bribe Ray not to testify. While these events *might* have caused some preju-

---

**11.** Most cases which adopt a *per se* rule that a defendant is denied effective assistance of counsel any time his attorney has a conflict of interest and which require no showing of prejudice involve *joint representation* of co-defend-ants. Although this Circuit has not adopted a *per se* rule in joint representation cases, we feel there is less justification for application of a *per se* rule in this case than there would be in the joint representation situation.

dice to Ray had he decided to go to trial, on this record there is no showing of *actual* prejudice. Ray does not claim that any of these occurrences discouraged him from going to trial or influenced him to plead guilty. Similarly, Ray was not prejudiced by Foreman's conflict of interest. As we have discussed earlier, Foreman's advice to Ray to plead guilty was not motivated by any desire on Foreman's part to receive money under the contracts with Huie or by any urgings of Huie.

We further note that Ray was fully aware of the potential conflict of interest in the Huie-Hanes-Ray contractual relationship. While we do not reach the question of whether Ray waived any objection to the conflict of interest,[12] Ray's awareness of the conflict, the full disclosure made to him by Hanes, and the warning that he received from Foreman about such arrangements at the time Foreman was hired strengthen our conviction that Ray was not prejudiced by the conflicts of interest.

■ Ray has also failed to show that he was denied effective assistance of counsel by inadequate investigation of the case by his attorneys. Several different investigations of the case were conducted—that of Hanes and his son, and their investigator Hayes, Huie's investigation, Foreman's investigation, and the investigation of the public defender's office. Evidence produced at hearing showed that numerous witnesses had been interviewed and that Ray's attorneys were aware of weaknesses in the State's case. Hanes' investigation of the case and his preparation for it was quite extensive. Foreman set up an office and lived in Memphis for a time while he made his investigation. In addition, Foreman had the benefit of all the other investigations. This Court has recognized that a defendant is not denied effective assistance of counsel even if his attorney conducts no independent investigation of his own but merely receives and relies upon a prior attorney's work product in going to trial. *See*

*Price v. Perini*, 520 F.2d 807 (6th Cir. 1975) (per curiam); *Berry v. Cowan*, 497 F.2d 1274 (6th Cir. 1974). We agree with the district court that Ray did not show that the investigation was inadequate or below the standards usually required of a criminal lawyer of ordinary skill.

■ Ray has also failed to establish his third basis for contending that he was denied effective assistance of counsel—that he was given incompetent advice by Foreman to plead guilty. Ray argues that the advice that there was "overwhelming evidence" against him and a 100 per cent chance of a guilty verdict was incompetent. In this argument he relies on the Hanes' view that they had a chance of obtaining an acquittal due to (1) the lack of a credible eyewitness, (2) Ray's representation to them that he did not kill Dr. King, (3) the inconclusive nature of the ballistics evidence, and (4) testimony of witnesses who said the shot came from the parking lot or nearby bushes rather than the bathroom window of the rooming house where Ray was staying. Ray also argues that the advice that there was a 99 per cent chance of Ray's receiving the death penalty was incompetent because, based on statistics for Shelby County, there was a slim chance of execution even if Ray had been convicted. We cannot view Foreman's advice to Ray as incompetent under the circumstances of this case. Hanes had identified certain weaknesses in the State's case, but the State's case was still quite strong. As the district court noted, the weaknesses "are by no means of the sensational nature which would explode the state's case, particularly in light of the substantial incriminating evidence pertaining to Ray's presence in Memphis on April 4, 1968, and his carefully contrived concealment and flight after the murder." Several attorneys testified at the evidentiary hearing that they considered the advice to plead guilty sound. Even Hanes, who hoped for an acquittal, admitted he had discussed the possibility of a

---

**12.** There is authority which suggests that any waiver of a conflict of interest must be made expressly and in a courtroom proceeding similar to that required when a defendant pleads guilty. *See United States v. Garcia*, 517 F.2d 272 (5th Cir. 1975).

guilty plea with Ray. We think it clear in this case that the advice which Ray received was "within the range of competence demanded of attorneys in criminal cases." See McMann v. Richardson, 397 U.S. 759, 771, 90 S.Ct. 1441, 1449, 25 L.Ed.2d 763, 773 (1970); Stout v. United States, 508 F.2d 951, 953 (6th Cir. 1975). As the Supreme Court said in McMann, supra, in discussing the performance required of attorneys in a guilty plea situation:

> As we said in Brady v. United States, ante, [397 U.S.] at 756–757 [90 S.Ct. 1463 at 1473–1474, 25 L.Ed.2d 747], the decision to plead guilty before the evidence is in frequently involves the making of difficult judgments. All the pertinent facts normally cannot be known unless witnesses are examined and cross-examined in court. Even then the truth will often be in dispute. In the face of unavoidable uncertainty, the defendant and his counsel must make their best judgment as to the weight of the State's case. . . . 397 U.S. at 769, 90 S.Ct. at 1448, 25 L.Ed.2d at 772.

\* \* \* \* \* \*

It is no denigration of the right to trial to hold that when the defendant waives his state court remedies and admits his guilt, he does so under the law then existing; further, he assumes the risk of ordinary error in either his or his attorney's assessment of the law and facts. 397 U.S. at 774, 90 S.Ct. at 1450, 25 L.Ed.2d at 775.

Finally, we reject Ray's contention that he was denied effective assistance of counsel by surveillance, interception of mail, and delivery of attorney-client communications to the prosecution. We do not believe that the government actions in the circumstances of this case require us to overturn Ray's guilty plea. Ray was unable to show that mail inspection, surveillance, or interception of privileged communications affected the preparation of his defense or prejudiced him in any way. Nor was there any evidence to indicate that government receipt of any information contributed to Ray's decision to enter the guilty plea. We further observe that Ray was specifically informed by Judge Battle that in pleading guilty he was waiving his right to object to the denial of his motions relating to surveillance and consultation with his attorney. In light of these factors and the Supreme Court's opinion in Tollett v. Henderson, 411 U.S. 258, 267, 93 S.Ct. 1602, 36 L.Ed.2d 235 (1973), we find that Ray is not entitled to have his conviction overturned on this ground.

We have considered Ray's other contentions and find them to be without merit.

The judgment of the district court is

AFFIRMED.